**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ANDREA RAY,<br><br>               Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>               Defendant. | CASE NO. 1:22-CV-01608-AMK<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>__MEMORANDUM OPINION AND ORDER__ |

Plaintiff Andrea Ray, o.b.o. L.R. ("Plaintiff" or "Ms. Ray") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her minor daughter's application for Supplemental Security Income ("SSI").  (ECF Doc. 1.) This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 8.)

For the reasons set forth below, the Court **VACATES and REMANDS** the decision of the Commissioner for further proceedings consistent with this Order.  On remand, the ALJ should consider all evidence of record and articulate a clear and accurate explanation for his functional equivalence findings, building a logical bridge between the evidence and the result.

## I.  Procedural History

On July 27, 2020, Ms. Ray protectively filed an application for children's SSI on behalf of her child L.R. with an alleged disability onset date of January 1, 2019.  (Tr. 139.)  She alleged L.R. was disabled due to anxiety, oppositional defiant disorder ("ODD"), stomach issues, ADHD, and insomnia.  (Tr. 74, 78.)  The application was denied at the initial level (Tr. 70-74)

1

and upon reconsideration (Tr. 76-78), and she requested a hearing (Tr. 84-87).  On August 19, 2021, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 38-53.)

On August 30, 2021, the ALJ issued a decision finding L.R. was not under a disability within the meaning of the Social Security Act since July 23, 2020, the date the application was filed.  (Tr. 26-33.)  On January 6, 2021, the Appeals Council denied Ms. Ray's request for review, making the ALJ decision the final decision of the Commissioner.  (Tr. 1-4.)  Ms. Ray then filed the pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 10, 11).

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

L.R. was born in 2008 and was 10 years old on the alleged disability onset date, making her a school-age child under Social Security regulations; she turned 12 years old in 2020, making her an adolescent under Social Security regulations by the time of the ALJ decision.  (Tr. 26, 56.) L.R. had not engaged in any substantial gainful activity by the time of the decision.  (Tr. 26.)

### B.      Medical Evidence

#### 1.      Medical Records

On September 26, 2019, L.R. attended a pediatric well visit with Kimberly Mead, APRN, CNP.  (Tr. 308-12.)  At that visit, it was noted that her GI issues had been well controlled and she no longer required Miralax.  (Tr. 308.)  She had poor compliance with her asthma medication because she didn't like taking medicine.  (*Id.*)  CNP Mead noted that L.R. was struggling with anxiety, especially at school.  (*Id.*)  She was talking back to teachers, not focusing, had frequent daydreaming, and was distracted easily; she also complained of daily abdominal pain and feeling nauseous at school but not during the weekend.  (*Id.*)  She was talking back to her mother at home and had behavior outbursts.  (*Id.*)  Her mother had tried both removing privileges and

2

giving positive reinforcements, but neither approach was helpful.  (*Id.*)  CNP Mead referred L.R. for child psychology due to behavior problems.  (Tr. 311.)

On October 21, 2019, L.R. underwent an initial evaluation at the Center for Pediatric Behavioral Health with Catrina Litzenburg, Ph.D.  (Tr. 302-06.)  Ms. Ray reported that L.R. had been getting into trouble at school for talking back to adults, cursing, and being disruptive in the classroom; she said L.R. was also oppositional and noncompliant at home.  (Tr. 303.)  Although one teacher in the past had voiced concern with inattention and daydreaming, Ms. Ray said this was the first time L.R.'s teachers reported so much difficulty in managing her behavior.  (*Id.*).  The behaviors were reportedly occurring multiple times per week.  (*Id.*)  Ms. Ray had attempted to remove privileges to enforce positive behaviors, but that was not effective.  (*Id.*)  L.R. said she was distracted by her thoughts daily, and that school personnel had encouraged her to report concerns with bullying, which was sometimes helpful.  (*Id.*)  On examination, L.R. was appropriate, engaged, and responsive to direct instructions.  (Tr. 304.)  Her mood and affect were euthymic, and she was reactive within a normal range, but she displayed mild irritability.  (*Id.*)  Dr. Litzenburg noted school problems, insomnia, peer difficulties, and parent-child relationship problem.  (Tr. 306.)  She provided an overview of psychological services, discussed healthy sleep and behavior management, and scheduled a follow up visit.  (Tr. 305-06.)

L.R. attended psychotherapy with Dr. Litzenburg on November 6, 2019.  (Tr. 300-01.)  L.R.'s anxiety had reportedly increased since the previous visit, resulting in her missing several days of school.  (Tr. 301.)  Dr. Litzenburg recommended cognitive behavioral therapy ("CBT") and exposure therapy.  (*Id.*)  Dr. Litzenburg updated the diagnoses to include adjustment disorder with mixed disturbance of emotions and conduct, peer difficulties, and school problem.  (*Id.*)

L.R. returned for psychotherapy on November 13, 2019.  (Tr. 298-99.)  Her anxiety continued to increase since the previous visit.  (Tr. 298.)  Ms. Ray reported that L.R. had frequently called home from school and texted her in the middle of the night due to anxiety and not feeling well.  (*Id.*)  Dr. Litzenburg recommended that Ms. Ray not respond to the nighttime text messages and only respond at a set time each night.  (Tr. 299.)  Dr. Litzenburg obtained authorization to consult with L.R.'s school, recommended CBT and behavioral intervention, and scheduled a return appointment in a week.  (*Id.*)  Dr. Litzenburg spoke with Mr. Bruce at Apex Academy on November 15, 2019.  (Tr. 298.)  Mr. Bruce reported that much of L.R.'s anxiety stemmed from a certain class that she perceived as more challenging.  (*Id.*)  He had worked with the teacher to arrange supports for L.R., and created a plan for when L.R. could reach out to her mother if she experienced anxiety during the day.  (*Id.*)

At L.R.'s next psychotherapy appointment, on November 21, 2019, her family reported she had attended school every day with minimal phone calls home.  (Tr. 296-97.)  L.R. actively participated during this visit.  (Tr. 297.)   When she returned to psychotherapy on December 9, 2019, her family reported her functioning continued to improve and she had been attending school.  (Tr. 294.)  However, L.R. had gotten into trouble at school that day, and described feeling mad and sad.  (*Id.*)  Treatment interventions included CBT, exposure therapy, and behavior management.  (*Id.*)

On December 12, 2019, L.R. was seen by Collenn McNatt, CNP, in the pediatric gastroenterology clinic.  (Tr. 289-92.)  She complained of stomach pains for a few months, as well as regurgitation, constipation, bloating, vomiting, heartburn, and nausea.  (Tr. 290.)  CNP McNatt recommended Prilosec and Miralax daily.  (Tr. 292.)  She also discussed anxiety causing stomach pains and instructed L.R. to continue working with psychology.  (*Id.*)

4

L.R. returned to psychotherapy with Dr. Litzenburg on December 20, 2019.  (Tr. 285-86.)
Her family reported that her symptoms of anxiety had improved, but she continued to have
difficulty with conduct disturbance.  (Tr. 286.)  She had consistently attended school, but had
recently been suspended for four days due to fighting with another student.  (*Id.*)  L.R. said the
other student had been teasing her and she felt she had to defend herself.  (*Id.*)  L.R. actively
participated and responded positively during treatment.  (*Id.*)

L.R. returned to psychotherapy with Dr. Litzenburg on January 9, 2020.  (Tr. 280-81.)
Her family reported her symptoms of anxiety had improved, but she continued to have difficulty
with conduct disturbance.  (Tr. 281.)  Her family also reported that she had consistently attended
school since her prior encounter but was resisting getting up in the morning.  (*Id.*)  L.R. reported
two Fs and two Ds on her report card, and Ms. Roy added that she missed 16 days, was tardy 6
times, and had 6 early dismissals.  (*Id.*)  Dr. Litzenburg spoke with Behavior Specialist Mr.
Bruce at Apex Academy on January 23, 2020, who reported that L.R. had missed 16 school days
and could be withdrawn from school if she missed 20 days; Mr. Bruce also confirmed that Ms.
Ray had requested testing for learning concerns on January 21, 2020, and the school intervention
specialist had started that process.  (Tr. 278.)

L.R. attended a gastroenterology follow-up with CNP McNatt on January 23, 2020.  (Tr.
273-78.)  She was doing better on daily omeprazole, but continued to complain of nausea and
some epigastric pain.  (Tr. 277.)  CNP McNatt stopped omeprazole, started daily Pantoprazole,
and recommended an abdominal ultrasound.  (*Id.*)  CNP McNatt also noted L.R.'s complaints of
high anxiety and indicated: "I do feel this causes a majority of GI symptoms"; she recommended
close follow up with a psychologist and CBT, and said she would reach out to L.R.'s primary
care provider and psychologist to discuss starting anxiety medications.  (*Id.*)

L.R. returned to psychotherapy with Dr. Litzenburg on January 27, 2020.  (Tr. 270-72.)
Her family reported that her symptoms of anxiety had improved, but that she continued to have
difficulty with conduct disturbance.  (Tr. 270.)  L.R. completed PHQ-9 and GAD-7 testing, but
results were negative for depression and below the cutoff for moderate anxiety.  (Tr. 271.)  A
family member reported that L.R. had made statements about suicide the week prior and had
grabbed a bottle of medication she threatened to take.  (*Id.*)  L.R. said she did not have a plan to
harm herself and denied any current non-suicidal self-injury, suicidal, or homicidal ideation,
intent, or plan.  (*Id.*)  Dr. Litzenburg indicated she had initially conceptualized L.R.'s
presentation as an adjustment disorder related to identifiable stressors of peer difficulties and
poor academic performance, but now believed a diagnosis of ODD was more accurate in light of
L.R.'s pattern of angry/irritable mood, argumentative/defiant behavior, and vindictiveness during
interactions with multiple family members, school personnel, and some healthcare providers.
(*Id.*)  L.R.'s family reported that this had been occurring at least once weekly for more than six
months, and was associated with distress for her mother and impairment in social and
educational functioning.  (*Id.*)  Dr. Litzenburg noted that L.R.'s family was likely to benefit most
from behavior management to promote effective discipline.  (*Id.*)  Dr. Litzenburg updated L.R.'s
diagnoses to ODD, anxiety, and history of suicide attempt; she also provided safety precaution
education and established a safety plan for L.R.  (Tr. 272.)

L.R. returned to psychotherapy on February 10, 2020.  (Tr. 266-69.)  Her family reported
she was logging in to online school daily, but not for the full five hours required.  (Tr. 267.)  She
was also not sleeping on a regular schedule.  (*Id.*)  On examination, L.R. was alert, interactive,
and distracted throughout the visit.  (*Id.*)  She was moderately responsive to redirection.  (*Id.*)
L.R. had a broad and congruent affect and did not appear to be in any acute distress; she denied

6

self-harm or suicidal ideations.  (*Id.*)  Dr. Litzenburg noted satisfactory progress, but with a potential for increasing the intensity or level of care for L.R.'s psychotherapy treatment.  (Tr. 267-68.)

On February 13, 2020, L.R. returned to CNP McNatt for follow up regarding her GI symptoms.  (Tr. 261-66.)  Labs and an abdominal ultrasound had come back essentially normal. (*Id.*)  L.R. continued to report frequent nausea despite protonix and occasional abdominal pain. (*Id.*)  CNP McNatt indicated these symptoms were likely related to anxiety, stress, and lack of sleep.  (*Id.*)  She added Bentyl for IBS, scheduled a gastric emptying study, and referred L.R. for consultation with pediatric psychology.  (*Id.*)

L.R. returned to psychotherapy on February 24, 2020.  (Tr. 257-59.)  Dr. Litzenburg noted that L.R.'s baseline functional status was "markedly ill-intrusive symptoms that distinctly impair social/occupational function or cause intrusive levels of distress," slightly worse since February 14, 2020.  (Tr. 257.)  L.R. was observed to be alert and interactive, angry and tearful throughout the visit, and moderately responsive to redirection.  (*Id.*)  Dr. Litzenburg indicated L.R. was not progressing in response to treatment.  (Tr. 258.)  She required significant redirection and reminders of established rules for communication.  (*Id.*)

On March 6, 2020, L.R. attended a psychosocial assessment and evaluation with Chloe Freeman, MHS, MA, for functional abdominal pain.  (Tr. 251-56.)  L.R. reported stomach aches almost daily, with the pain occurring at night and in the mornings; she did not identify a trigger. (Tr. 252.)  She also reported nausea associated with the stomach aches and stated she was often afraid she would vomit, which led to increased anxiety.  (*Id.*)  Ms. Ray said she was not aware the visit was scheduled for abdominal pain, and said L.R.'s behavior was her primary concern. (*Id.*)  She described typical behavior as "lashing out, throwing things, cussing at me, hitting

people, knocking things over, slamming doors, screaming, and crying." (*Id.*) She reported she would like a referral to psychiatry "for medications." (*Id.*) As to social history and functioning, Ms. Freeman noted L.R.'s history of bullying and lack of friends, with a recent transition to home school noted as a significant stressor. (*Id.*) Ms. Ray reported Apex Academy had threatened to kick L.R. out of school due to excessive absences and behavioral issues—including physical fights with peers and defiance—and that she had removed L.R. to begin home school. (Tr. 253.) L.R. was within normal limits on examination, except for limited judgment and insight and sometimes arguing with her mother. (Tr. 253-54.) Ms. Freeman opined that it was likely L.R.'s anxiety that was impacting her GI symptoms. (Tr. 256.) She recommended that L.R. begin CBT for functional abdominal pain. (*Id.*) L.R. also recommended a psychology consult to evaluate for ADHD and to continue psychotherapy with Dr. Litzenburg. (*Id.*)

L.R. began behavioral treatment for functional abdominal pain in a virtual visit with Ms. Freeman on April 9, 2020. (Tr. 246-48.) Ms. Ray continued to assert that her chief concerns were L.R.'s behavioral issues, anger outbursts, and poor school performance; she was less concerned about abdominal pain. (Tr. 247.) Mr. Freeman recommended a return visit in two to three weeks, an appointment with psychiatry to evaluation for ADHD, and continued psychotherapy (Tr. 248.) She returned for further treatment on April 24, 2020. (Tr. 241-43.)

Megan Davis, LPC, at Ohio Guidestone completed a diagnostic evaluation of L.R. on April 9, 2020. (Tr. 418-30.) LPC Davis did not speak with L.R. while completing the evaluation, instead speaking with Ms. Ray. (Tr .422.) Ms. Ray reported that L.R. would lash out, didn't listen to anyone, refused to do anything asked of her, and lost her temper very easily. (Tr. 418.) She also reported that L.R. became physical and attacked her peers, was very disrespectful, struggled to make friends, had difficulty taking responsibility for her actions, had

no remorse, threatened to punch or hit pregnant family members, hit her mother, did not complete her schoolwork, and was failing her classes.  (*Id.*)  Ms. Ray said she was unsure if L.R. cared about others, but that L.R. said she felt no one in her family cared about her.  (*Id.*)  Ms. Ray also reported that L.R. said she was stupid, often hit herself, was often worried, experienced somatic symptoms like a racing heart, upset stomach, nausea, and panic attacks, and became irritable when stressed and overwhelmed.  (*Id.*)  LPC Davis recommended treatment to include psychotherapy, psychosocial rehabilitation, and psychiatry.  (Tr. 423.)

On May 8, 2020, L.R. underwent a virtual new patient evaluation with Jess Levy, M.D., at Child and Adolescent Psychiatry.  (Tr. 231-41.)  L.R. was anxious and suspicious, had significant difficulty maintaining her composure, and tended to anger as a defense mechanism.  (Tr. 232.)  Dr. Levy noted concerns of executive function deficits which contributed to reactive anger.  (*Id.*)  L.R. was alert on examination but hid her face from the camera and displayed avoidant eye contact and guarded demeanor, leaving the room when stressful topics were discussed; her mood was angry and anxious, with a reactive and anxious affect; her thought content was avoidant and minimizing, and she seemed defensive and did not want to discuss areas of improvement; her cognition appeared intact, but her insight and judgment were impaired.  (Tr. 237.)  During the visit, L.R. refused to show her face and did not want to engage in conversation; when talking about her emotions and behaviors, she became upset and walked away.  (Tr. 234.)  When Dr. Levy discussed prescribing an SSRI with Ms. Ray, L.R. became suspicious and refused to take medications; Dr. Levy suggested Ms. Ray use the generic name for the medication and call it a "supplement" to encourage compliance.  (Tr. 232.)  Dr. Levy found L.R. met the criteria for separation anxiety disorder, unspecified anxiety disorder of childhood, executive function deficit, and ODD; but she suspected the oppositional behaviors

9

might be in the context of anxiety and poor frustration tolerance.  (*Id*.)  Dr. Levy started L.R. on

Zoloft 25 mg daily, referred her to the ADHD Center for Evaluation and Treatment ("ACET"),

and recommended psychotherapy for coping skills.  (*Id.*)

L.R. began mental health therapeutic behavioral services ("TBS") with caseworker

Robert Williams, QMHSBA, CMSBA, at Ohio Guidestone on May 20, 2020.  (Tr. 433-35.)  She

continued to meet with Mr. Williams for TBS at least once per week, through June 2021.  (Tr.

433-507, 526-611, 774-850.)  During sessions on May 20 and 27, June 1, June 8, June 10, June

15, June 17, June 22, June 24, June 29, July 1, July 13, July 15, July 20, July 22, July 27, July

29, August 5, August 12, August 19, and August 24, 2020, Mr. Williams provided solution-

focused interventions and emotional and behavioral management treatment.  (Tr. 434, 437, 440,

443, 446, 449, 452, 455, 458, 461, 464, 467, 470, 473, 476, 479, 482, 485, 491, 497, 500, 503,

506.)  He educated L.R. on reducing hostile behaviors, practicing positive behaviors with others,

listening to her mother, taking her mediation as prescribed, and completing her schoolwork.  (Tr.

434, 437, 440, 443, 449, 452, 455, 458, 461, 464, 467, 470, 473, 476, 479, 482, 485, 491, 497,

503, 506.)  L.R. responded to Mr. Williams that she was a work in progress and would listen to

her mother, take her medications, try to change her behaviors, and calm herself down.  (Tr. 437,

440, 443, 449, 452, 455, 458, 464, 467, 470, 473, 476, 482, 485, 491, 497, 503, 506.)

At the June 8, August 3, August 10, August 17, 2020 TBS visits, Mr. Williams noted

L.R. had not made progress on her goals; L.R. said she hated her mother and did not want to

listen to her, and refused to take her medication.  (Tr. 446, 488, 494, 500.)  Mr. Williams

educated L.R. on her need to listen to her mother and do what was asked of her, including taking

her medications as prescribed.  (*Id.*)  At the June 24, 2020 visit, L.R. admitted that she was trying

to make changes in her behavior and that she was taking her medications, but not always on a

regular basis.  (Tr. 461.)  Mr. Williams reminded L.R. that she needed to take her medication as described in order for it to be effective.  (*Id.*)

L.R. attended a virtual medication management visit with Dr. Levy on July 22, 2020. (Tr. 223-26.)  L.R. was very hesitant to show her face on camera, covering her face with her hands.  (Tr. 223.)  Her anxiety and mood were reportedly improving since the last visit, but she continued to be annoyed easily.  (*Id.*)  She was reportedly compliant with prescribed Prozac 20 mg, with no side effects.  (*Id.*)  Mental status examination findings were unremarkable, except that she refused to show her face, avoided eye contact, and presented as guarded, shy, and anxious about showing her face on camera; she was more agreeable, and her insight and judgment were improving.  (Tr. 226.)  Dr. Levy increased Prozac to 30 mg daily, with instructions to go back down to 20 mg if irritability worsened.  (Tr. 224.)  Plans were discussed to transition L.R. to a new provider after Dr. Levy left Cleveland Clinic in September.  (*Id.*)

L.R. returned for a virtual medication management visit with Dr. Levy on September 4, 2020.  (Tr. 656.)  Dr. Levy noted concerns of emotional reactivity and defiant behaviors in multiple settings; the presentation was also concerning for ADHD.  (*Id.*)  L.R. had stopped taking Prozac, reporting difficulty tolerating Prozac due to concerns of nausea at high dosages. (*Id.*)  Dr. Levy continued to be concerned for executive disfunction, noting reports that that L.R. got distracted, had trouble focusing, got bored easily, and was impulsive.  (*Id.*)  Past screenings were mixed regarding an ADHD diagnosis.  (*Id.*)  Dr. Levy also noted oppositional traits, including stealing, "hanging with the wrong crowd," and skipping school.  (*Id.*)  L.R.'s mental status examination findings were largely unremarkable, including an upbeat demeanor and euthymic affect, but Dr. Levy noted L.R. was initially not at home; she was with peers eating ice cream, and came in toward the end of the encounter.  (Tr. 659.)  Dr. Levy also noted issues with

11

attention and concentration and questionable judgment after leaving home without a parent's permission.  (*Id.*)  Dr. Levy noted parental concerns regarding anxiety, irritability, defiant behaviors, and impulsivity.  (Tr. 657.)  Dr. Levy restarted L.R. on a lower dose of Prozac at 20 mg daily, due to the reported side effects at the 30 mg dose.  (*Id.*)  He instructed L.R. to return in one month for follow up with Meagan Houser.  (*Id.*)

L.R. attended an initial medication management visit with Meagan Houser, CNP, on October 5, 2020.  (Tr. 640-50.)  L.R. had again self-discontinued Prozac, complaining of GI side effects and feeling "shaky."  (Tr. 641.)  L.R. had an irritable mood and was observed to be labile during the visit.  (*Id.*)  L.R. was minimally engaged on examination, with poor eye contact and inappropriate body language; her mood was irritable, her affect labile, and her thought processes were evasive.  (Tr. 646.)  She demonstrated a marked impairment of judgment and had poor insight.  (*Id.*)  CNP Houser administered a screening for bipolar disorder.  (Tr. 641.)  Ms. Ray denied a pattern of high and low moods and described L.R.'s baseline as having difficulty sleeping, high energy, trouble focusing, tangential thoughts, and impulsivity.  (*Id.*)  Ms. Ray reported that L.R.'s behavior had escalated recently, and she had to resort to calling the police because of L.R.'s physical aggression, including kicking holes in the walls, hitting objects, and involvement in physical fights.  (*Id.*)  L.R. also had poor sleep hygiene and frequently slept during the day and was awake at night.  (*Id.*)  CNP Houser was concerned about the aggressive behavior and recommended that L.R. trial Risperdal 0.25 mg daily at bedtime to reduce aggression and improve sleep.  (*Id.*)  L.R.'s diagnoses were listed as aggressive behavior, anxiety, executive function deficit, academic underachievement, and oppositional behavior, with notes to rule out ADHD, ODD, and mood disorder.  (*Id.*)

At a follow up medication management visit with CNP Houser on October 28, 2020, Ms. Ray reported that L.R. did not start the Risperdal after the last visit, and said she felt the larger problem was ADHD.  (Tr. 631-40.)  L.R. was "only somewhat cooperative" on examination; she was moderately engaged with inconsistent eye contact and appropriate body language; her affect was full and appropriate; she demonstrated moderate difficulty maintaining focus and was easily distractible, she demonstrated moderate impairment of judgment and fair insight.  (Tr. 635.) L.R. reported continued irritability and that her mood was "mad" most of the time; when she got mad, she would slam doors and sometimes shove others.  (Tr. 632.)  CNP Houser started L.R. on a trial of Intuniv 1 mg daily at bedtime.  (*Id.*)  CNP Houser diagnosed GAD and ADHD, and noted that L.R. presented a chronic moderate risk of harm to herself or others.  (*Id.*)

On November 19, 2020, L.R. followed up with CNP McNatt regarding her GI issues. (Tr. 628-29.)  CNP McNatt noted that L.R. was doing well from a GI standpoint and was off all GI medications.  (Tr. 629.)  She complained of stomach pains and nausea with anxiety or if she needed to go into school, but had no heartburn or dysphagia.  (*Id.*)

L.R. followed up with CNP Houser for medication management on December 2, 2020. (Tr. 620-28.)  L.R. reported feeling less irritable on the Intuniv, but her mother reported that the medication did not seem to improve her irritability.  (Tr. 620.)  CNP Houser noted that L.R.'s mood was calm and cooperative when speaking directly to her, but that L.R. was irritable when her mother was present.  (*Id.*)  On examination, L.R. was cooperative, actively engaged with normal eye contact, appropriate body language, and full and labile affect, but had an irritable mood and demonstrated slight difficulty in maintaining focus, mild impairment of judgment, and fair insight.  (Tr. 623-24.)  L.R. reported difficulty in concentration and focus.  (Tr. 620.)  CNP Houser continued L.R. on Intuniv and started Adderall 5 mg once daily, with instructions to

increase to twice daily if L.R. tolerated it well.  (*Id.*)  L.R. reported severe ongoing problems with anxiety and ADHD.  (Tr. 621.)  Treatment compliance was good.  (*Id.*)

L.R. returned to CNP Houser for medication management on February 9, 2021.  (Tr. 862-67.)  Her mood was reported to be predominately irritable, but she had also been oppositional and refused to do some of her school work, missing 16 days that semester.  (Tr. 862*.*)  She had stopped all medications since the last visit.  (*Id.*)  Treatment compliance was noted as poor.  (Tr. 864.)  On examination, L.R. was oppositional and looked at her phone the whole time; she had poor eye contact, guarded and defensive/hostile demeanor, labile and irritated mood, agitated affect, and poor insight and judgment.  (Tr. 863, 866.)  She reported a lot of anxiety and nausea, and that she would not go places by herself.  (Tr. 862.)  CNP Houser restarted Intuniv 1 mg and Adderall XR 10 mg once daily.  (Tr. 862*.*)

L.R. returned for medication management with CNP Houser on March 12, 2021.  (Tr. 879-84.)  She was alert and interactive on examination, with appropriate eye contact and guarded demeanor, angry and labile mood, circumstantial thought processes, demonstrated issues with attention and concentration, and poor insight and judgment.  (Tr. 883.)  L.R. reported being more angry since the last visit, and her mother agreed.  (Tr. 879.)  Ms. Ray noted that L.R. was destructive at times, sometimes punching holes in the wall or breaking her phone.  (*Id.*)  CNP Houser discontinued Adderall due to the side effects, continued Intuniv, and trialed Abilify 2 mg daily.  (*Id.*)  She updated L.R.'s diagnoses to intermittent explosive disorder and ADHD.  (*Id.*)  CNP Houser noted that L.R. spoke on the phone with her therapist twice per week, typically on Mondays and Wednesdays. (Tr. 880.)

At medication management follow up on March 26, 2021, L.R. reported a positive improvement and reduction in symptoms of aggressive behavior since starting Abilify 2 mg.  (Tr.

896-901.)  But L.R. and Ms. Ray noted there was still room for improvement.  (Tr. 896.)  CNP

Houser observed that L.R. was less guarded and more interactive and pleasant.  (*Id.*)  On

examination, L.R. was alert and interactive, had appropriate eye contact, labile mood, full affect,

demonstrated issues with attention and concentration, and demonstrated improving insight and

judgment.  (Tr. 900.)  CNP Houser recommended continuing Abilify and increasing to 5 mg

once daily; she discontinued Intuniv due to L.R.'s reports of fatigue and weakness.  (Tr. 896.)

L.R. reported medication side effects on two days later and was told to return to her prior

dose of Abilify.  (Tr. 911-13.)  She requested and obtained Zofran for nausea shortly thereafter.

(Tr. 914.)  After complaining of continued medication side effects on the lower Abilify dosage,

including nausea and shakiness, L.R. was told to discontinue Abilify.  (Tr. 916-17.)

L.R. returned to medication management with CNP Houser on April 23, 2021, reporting

a continued irritable mood.  (Tr. 939-44.)  Ms. Ray reported L.R. was threatening to fight a peer,

pushed Ms. Ray the day before, and was on the verge of fighting her cousin.  (Tr. 939.)  On

examination, L.R. was alert and interactive, with appropriate eye contact, labile mood, and full

affect, but demonstrated issues with attention and concentration, and impaired insight and

judgment.  (Tr. 943.)  CNP Houser noted that Abilify and Intuniv were discontinued due to

complaints of nausea, weakness, and tremor, and recommended a trial of Zoloft 25 mg.  (Tr.

939.)  CNP Houser listed L.R.'s diagnoses as: GAD; ADHD, combined type; and ODD.  (*Id.*)

L.R. had continued to meet at least weekly with Mr. Williams for TBS, from August

2020, through June 16, 2021.  (Tr. 523-611, 761-850, 969-1120.)  Treatment notes remained

largely consistent, with Mr. Williams providing solution-focused interventions and emotional

and behavioral management.  (*See id.*)  Mr. Williams often coached L.R. on reducing her

oppositional and hostile behaviors, listening to her mother's instructions, completing her

schoolwork, changing her attitude, and having a willingness to change her behaviors.  (*Id.*)  He coached L.R. on recognizing that she was aware of how to change her behavior when she wanted her mother to buy something for her or to avoid consequences, but would turn back on her mother again.  (Tr. 987, 1095, 1103.)  Mr. Williams often reminded L.R. to take her medications to experience their therapeutic benefits.  (*See, e.g.*, Tr. 1015, 1039, 1099, 1111.)

### 2.    Education Records

During the 2019-2020 school year at Apex Academy, L.R. received: failing grades in Math, Science, and Social Studies; a D in Language Arts; and passing grades in Physical Education, Art, and Educational Technology and Online Learning.  (Tr. 189.)  L.R. also received a four-day suspension—between December 19, 2019, and January 7, 2020—for fighting with another student. (Tr. 186).

On October 28, 2020, L.R. was referred for a special education evaluation.  (Tr. 683-87.) Ms. Ray requested the evaluation based on developmental concerns, noting L.R. was recently diagnosed with ADHD, ODD, and general anxiety disorder by the Cleveland Clinic.  (Tr. 683.) Her psychiatric medications were being managed at the Cleveland Clinic and she was receiving counseling at Guidestone.  (*Id.*)  Her teachers reported she was having problems with attendance and with keeping her camera on during virtual classes, and her parent reported medication effects.  (*Id.*)  Her curriculum-based assessments showed low scores for math and reading.  (*Id.*) Ms. Ray reported that L.R. had demonstrated symptoms of anxiety and during a recent test, and required significant support from her mother and counselor.  (Tr. 685.)

An initial evaluation meeting was held on November 12, 2020, to determine if L.R. had a disability and to develop an education plan for her.  (Tr. 689, 693.)  An Evaluation Team Report ("ETR") summarizing the team's findings.  (Tr. 693-737.)  The Wechsler Intelligence Scale for

16

Children – V (WISC) was administered to assess L.R.'s cognitive skills.  (Tr. 703, 705.)  Her full-scale IQ score was 73 (very low), indicating that her cognitive skills may interfere with her ability to access and progress in the general education curriculum, and that she needs information presented in more than one modality and may experience difficulty if information is presented in only one modality, particularly in multi-step processes.  (Tr. 705.)  The Wechsler Individual Achievement Test – III (WIAT) was also administered to formally assess her academic skills.  (Tr. 705, 707, 709.)  Her reading subtests showed adequate scores.  (Tr. 707.)  Her math subtests showed low to low average scores; she was able to respond correctly for simple, one-stop operations but began to err when the problems required more than one step or more than one operation.  (*Id.*)  Her written expression subtest was in the low range.  (Tr. 709.)

Based on the results of L.R.'s evaluation, school psychologist Donna Kielinski concluded that L.R.'s behaviors would impact her ability to progress in the general education curriculum, and she needed to be able to manage her emotions, especially anxiety, in order to actively engage and participate within the general education curriculum.  (Tr. 701, 715.)  The evaluation team determined that L.R. met the state criteria for having a disability and that she demonstrated an educational need that required specially designed instruction.  (Tr. 733.)  She was eligible for special education and related services in the category of Other Health Impaired (Minor).  (*Id.*)  The team made this determination based on her medical diagnosis of anxiety and its impact on her performance within the general education curriculum.  (*Id.*)

An initial individualized education program ("IEP") was put in place for L.R. beginning on January 15, 2021.  (Tr. 743.)  The IEP profile noted that L.R. had previously received small group differentiated instruction in the regular classroom with a paraprofessional during the 2019-2020 school year, until March 16, 2020, when she transitioned to online support for the rest of

the school year.  (Tr. 744.)  L.R. had continued in online learning in the 2020-2021 school year,

with intensive interventions with the intervention specialist.  (*Id.*)  L.R.'s teachers noted that she:

struggled with attending classes and completing assignments, and kept her camera off because

she was self-conscious; had issues with appropriately expressing and verbalizing her emotions,

thoughts, and feelings when uncomfortable situations arose, becoming anxious, angry, and

frustrated; and struggled with self-confidence, advocacy, and esteem.  (Tr. 745, 748.)

### 3.    Opinion Evidence

#### i.    School Behavior Specialist

L.R.'s behavior specialist at Apex Academy, Mr. Ron Bruce, completed a teacher

questionnaire on October 1, 2020.  (Tr. 515-22.)  He had known L.R. for two years and met with

her daily for behavior AM and PM check-ins and check-outs.  (Tr. 515.)  L.R. had an unusual

degree of absenteeism because of her anxiety.  (*Id.*)  On a checkbox form, he noted that L.R. had

obvious problems in some areas of acquiring and using information.  (Tr. 516.)  She had

problems in interacting and relating to others, including severe problems in expressing anger

appropriately (occurring on a weekly basis) and slight problems in respecting and obeying adults

in authority (occurring on a daily basis).  (Tr. 518.)  He found it necessary to implement behavior

modification strategies with L.R., including check-ins and checkout with the behavior specialist,

allowed her to change classrooms, and gave her frequent breaks.  (*Id.*)  She had no problems in

moving about and manipulating objects.  (Tr. 519.)  She had serious problems in handling

frustration appropriately (occurring on a weekly basis) and in identifying and appropriately

asserting emotional needs (occurring on a daily basis).  (Tr. 520.)  L.R. worked very closely with

the behavior specialist to implement coping skills.  (*Id.*)

### ii.     School Intervention Specialist

Intervention specialist Mary Battenfield completed a teacher questionnaire on April 13, 2021, reporting she had been working with L.R. since Christmas.  (Tr. 852-55.)  She reported L.R. was attending all regular classes virtually, with services "for math and social/emotional." (Tr. 852.)  When asked about L.R.'s attendance, she noted that it was difficult to determine if L.R. was present even when she attended class because she kept her camera off, did not respond or participate in class, and missed a lot of class work; this made it hard to assess L.R.'s ability to acquire and use information.  (Tr. 853.)

With respect to L.R.'s ability to begin, carry through, and finish activities, Ms. Battenfield indicated L.R. did not complete classwork and refused to ask for help.  (*Id.*)  With respect to L.R.'s ability to initiate and sustain emotional connections with others and respond to criticism, Ms. Battenfield noted L.R. tended to be a loner and would "log out of the session and not come back" if she was "called out by the teacher for something."  (*Id.*)  With respect to L.R.'s ability to cope with stress and changes in her environment, Ms. Battenfield reported: "[L.R.] is unable to cope with stress.  She will give up quickly and refuse to complete work or assessments and will leave the meeting entirely."  (Tr. 854.)

When asked to identify other problems adversely effecting L.R., Ms. Battenfield listed: "Anxiety, refusal to try, refusal to talk, does not want help."  (Tr. 855.)  When asked for additional comments regarding behavior and classroom performance, she noted elevated Behavior Assessment System for Children ("BASC") scores for: hyper, aggression, conduct, anxiety, depression, somatization, attention, learning problems, atypical, and withdrawal.  (*Id.*)

### iii. State Agency Reviewers

On October 22, 2020, state agency consultant, Leslie Rudy, Ph.D., found L.R. had severe impairments: anxiety and obsessive-compulsive disorders. (Tr. 57.) She found her to have "less than marked" limitations in the functional domains of acquiring and using information, attending and completing tasks, and interacting and relating to others. (Tr. 58.) She found L.R. had no limitations in the domains of moving about and manipulating objects and health and physical well-being. (Tr. 58-59.) On reconsideration on March 5, 2021, Irma Johnston, Psy.D., found L.R. had medically determinable impairments: anxiety, obsessive-compulsive disorders, and neurodevelopmental disorders. (Tr. 64-65.) Dr. Johnson found L.R. had "less than marked" limitations in the functional domains of acquiring and using information, attending and completing tasks, interacting and relating to others, and health and physical well-being. (Tr. 65-66.) She found no limitations in the domain of moving about and manipulating objects. (Tr. 65.)

### C. Hearing Testimony

At the hearing on August 19, 2021, Ms. Ray testified on behalf of L.R., stating that L.R. was 12 years old, in seventh grade, had been attending class virtually, and was attending classes in person at the time of the hearing. (Tr. 41.) L.R. had not done well in school and had poor grades and attendance. (*Id.*) She had been promoted to seventh grade because of an IEP. (*Id.*)

Ms. Ray testified that L.R. was disabled because she had very severe anxiety, ODD, aggression, did not follow directions or listen to anyone, and was not able to attend school because she was sent home a lot and had gotten into fights at school. (Tr. 42.) L.R. received counseling from two providers, one in school and one outside of school. (*Id.*) Ms. Ray testified that L.R. saw the school counselor every day she was at school, and the outside counselor provided services on a day-to-day basis (by phone, due to COVID-19 restrictions). (*Id.*) L.R.

was on Zoloft, which had recently been increased from 25 mg to 50 mg due to strong anxiety, agitation, and aggression.  (Tr. 42-43.)  When aggressive, L.R. would swing at and try to hit her mother, and would throw and break things.  (Tr. 43.)  She would also get into physical fights with her older sister (who was not disabled and was an honor student).  (Tr. 44.)  L.R.'s doctor also recommended Ritalin, but was planning to slowly introduce that medication because of severe side effects L.R. had while trialing other medications.  (Tr. 42-43.)  Ms. Ray had not noticed any improvement with the increased dosage of Zoloft, but it had not been long enough to tell at that point.  (Tr. 43-44.)  L.R. had side effects from the Zoloft, including nausea, and was taking Zofran to counteract the nausea.  (Tr. 51.)

Ms. Ray testified that L.R. has difficulty controlling her emotions; when she became upset, Ms. Ray would call L.R.'s counselor on his personal number to try to calm her down.  (Tr. 45-46.)  At times, L.R. had done things that had put her in danger, such as leaving the house in the middle of the night.  (Tr. 46.)  She had one friend, who she often fought with.  (*Id.*)

In April of 2020, L.R. was asked to leave school and attend homeschooling.  (Tr. 46-47.)  She had been getting in physical altercations at school, and had missed many days of school due to attending appointments.  (Tr. 47.)  She was in danger of being expelled.  (*Id.*)  Ms. Ray removed her from school and had her attend virtual classes.  (*Id.*)  However, L.R. would leave the computer, complain that she didn't understand the work and couldn't concentrate, and would just get up and walk off.  (Tr. 47-48.)  When Ms. Ray attempted to sit with L.R. to complete her work, L.R. would become upset.  (Tr. 48.)  Even with Ms. Ray sitting next to her, L.R. would not pay attention and would not focus on the computer.  (*Id.*)

Ms. Ray testified that L.R. had severe anxiety that was triggered when she attended school or was in crowds.  (Tr. 48-49.)  L.R.'s anxiety symptoms included sweating, racing heart,

and nausea.  (Tr. 48.)  Ms. Ray would walk L.R. directly to her classroom and do breathing

exercises as taught by her counselor, but L.R. would constantly call her from school and ask to

come home.  (*Id.*)  L.R. would vomit daily when she experienced severe anxiety, and would have

such episodes three or four times per month.  (Tr. 50.)  At the time of the hearing, school had

been in session only two days; L.R. experienced vomiting episodes both days, but had been able

to stay in school the previous day.  (Tr. 50-51.

### III.    Standard for Disability

To qualify for SSI benefits, "[a]n individual under the age of 18 shall be considered

disabled . . . if that individual has a medically determinable physical or mental impairment,

which results in marked and severe functional limitations, and which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 1382c(a)(3)(C)(i).  To qualify, a child recipient must also meet certain

income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

Social Security regulations prescribe a three-step sequential process to evaluate children's

disability claims. 20 C.F.R. § 416.924(a).  At step one, a child must not be engaged in

"substantial gainful activity." 20 C.F.R. § 416.924(b).  At step two, a child must suffer from a

"severe impairment." 20 C.F.R. § 416.924(c).  At step three, disability will be found if a child

has an impairment, or combination of impairments, that meets, medically equals or functionally

equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To make the Step Three determination that a child "meets" a listing, the child's

impairment must be substantiated by medical findings shown or described in the listing for that

impairment. 20 C.F.R. § 416.925(d).  Alternately, to make a Step Three determination that a

child "medically equals" a listing, the child's impairment must be substantiated by medical

findings at least equal in severity and duration to those shown or described in the listing for that impairment. 20 C.F.R. § 416.926(a).  Finally, to make a Step Three determination that a child "functionally equals" a listing, the impairment must be found to be "of listing-level severity," meaning that it will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).

## IV.   The ALJ's Decision

In his August 30, 2021 decision, the ALJ made the following findings:[1]

1.    The claimant was born in 2008 and was a school-age child on July 23, 2020, the date the application was filed, and was an adolescent at the time of the hearing.  (Tr. 26.)

2.    The claimant has not engaged in substantial gainful activity since July 23, 2020, the application date.  (*Id.*)

3.    The claimant has the following severe impairments: oppositional defiant disorder, attention deficit hyperactivity disorder, intermittent explosive disorder, adjustment disorder with mixed emotions and conduct, anxiety, and mild intermittent asthma.  (*Id.*)

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)

5.    The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings.  (Tr. 27.)

6.    Based on the totality of the medical and school records, the undersigned finds the longitudinal effects of the claimant's severe mental impairments, including oppositional defiant disorder and her recently-diagnosed attention-deficit hyperactivity disorder, have caused her less than marked limitations in acquiring and using information AND in attending and completing tasks during the current adjudicating period.  (Tr. 28 (emphasis in original).)

7.    The undersigned finds the longitudinal effects of the claimant's oppositional defiant disorder, which manifests as anxiety, reactive anger, and one-time suicidal gestures in December 2019, establish less than

---

[1] The ALJ's findings are summarized.

marked limitations in interacting with others AND the emotional component of caring for self during the current adjudicating period. (Tr. 30 (emphasis in original).)

8.     The undersigned finds the longitudinal effects of the claimant's mild persistent asthma and gastrointestinal issues secondary to anxiety establish less than marked limitations in the physical component of caring for self AND for physical health and well-being. (Tr. 31 (emphasis in original).)

9.     Despite the claimant's acute exacerbations of asthma with exercise, the treated effects of the claimant's asthma and her gastrointestinal issues from anxiety have not imposed any limitations with moving about and manipulating objects during the current adjudicating period. (Tr. 32.)

Based on the foregoing, the ALJ determined that L.R. had not been under a disability, as defined in the Social Security Act, since July 23, 2020, the date the application was filed. (Tr. 33.)

## V.     Plaintiff's Arguments

Ms. Ray raises one issue for review:

The ALJ's decision denying L.R.'s claim is unsupported by substantial evidence when the evidence demonstrates that L.R. has marked limitations in the domain of interacting and relating to others and the domain of caring for self.

(ECF Doc. 10, p. 1.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245

F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Whether Findings of Less Than Marked Limitations in Interacting and Relating to Others and Caring for Self Were Supported by Substantial Evidence**

Ms. Ray asserts in her sole assignment of error that the ALJ's findings of less than marked limitations in the functional domains of interacting and relating to others and caring for self were not supported by substantial evidence.  (ECF Doc. 10, pp. 11-15.)  Specifically, she argues the ALJ failed to follow the "whole child" approach to functional equivalence under SSR 09-1p when he "improperly interjected his own medical opinion" by "repeatedly suggest[ing] that there [wa]s a volitional component to L.R.'s behavior."  (*Id.* at pp. 12-13.)  Although the ALJ based his findings in part on this "volitional component," Ms. Ray argues "no medical source, teacher, or parent has stated that L.R.'s behavior is volitional and not the result of a medically determinable impairment."  (*Id.* at p. 13.)  Ms. Ray further argues that the evidentiary record requires a finding of marked limitations in both domains.  (*Id.* at pp. 13-15.)

The Commissioner responds that the ALJ's finding of less than marked limitations in both domains was supported by the substantial evidence.  (ECF Doc. 11, pp. 13-17.)  As to the ALJ's findings regarding "volitional" elements of L.R.'s behavior, the Commissioner argues the objective record contains numerous mentions of "voluntary aspects" of L.R.'s behavior.  (*Id.* at pp. 16-17.)  In the alternative, the Commissioner argues any error in considering "the voluntary component" of L.R.'s behavior was harmless.  (*Id.* at p. 17.)

**1.      Legal Standard for Functional Equivalence**

To support a Step Three determination that a child functionally equals a listing, the ALJ must find his impairments are "of listing-level severity," meaning they will "result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(a).  Under Social Security regulations, a limitation is "marked" if the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete

26

activities." 20 C.F.R. § 416.926a(e)(2)(i).  Marked limitations are also described as limitations

that are "'more than moderate' but 'less than extreme'" and "the equivalent of the functioning

[the SSA] would expect to find on standardized testing with scores that are at least two, but less

than three standard deviations below the mean."  *Id.*

SSR 09-1p instructs that an ALJ should consider the "whole child" when determining

whether a child's impairments functionally equal a listed impairment, considering: how the child

functions; what functional domains are involved in performing activities; whether the child's

medically determinable impairments could account for limitations in the child's activities; and

the degree to which the child's impairments limit the child's ability to function.  *See* SSR 09-1p,

*Determining Childhood Disability Under the Functional Equivalence Rule—the "Whole Child"*

*Approach*, 74 Fed. Reg. 7527, 7528 (Feb. 17, 2009) (citing 20 C.F.R. §§ 416.926a(b)(2),

416.924a).  In making such an assessment, the ALJs is directed to consider the kinds of help or

support a child needs to function, recognizing that the amount of help or support received

(beyond what would be expected for a child of the same age without impairments) reflects a less

independent child with more severe functional limitations.  *Id.* (citing 20 C.F.R. 416.924a(b)).

## 2.    Whether ALJ Erred in Evaluating Functional Equivalence

Ms. Ray challenges the ALJ's determination as to two domains: interacting and relating

to others and caring for oneself.  The domain *interacting and relating to others* concerns how

well a child can initiate and sustain emotional connections with others, develop and use

language, cooperate with others, comply with rules, respond to criticism, and respect and take

care of the possessions of others. 20 C.F.R. § 416.926a(i).  The domain *caring for oneself*

considers how well a child can maintain a healthy emotional and physical state, including getting

their emotional and physical wants and needs met in appropriate ways, coping with stress and

changes in their environment, and taking care of their own health, possessions, and living areas. 20 C.F.R. § 416.926a(k).

Relevant to these two functional domains, the ALJ concluded that "the longitudinal effects of [L.R.]'s oppositional defiant disorder, which manifests as anxiety, reactive anger, and one-time suicidal gestures in December 2019, establish less than marked limitations in interacting with others [and] the emotional component of caring for self during the current adjudicating period." (Tr. 30.)  In support, the ALJ discussed: L.R.'s medication management visit with Dr. Levy in May 2020; her diagnostic evaluation at Ohio Guidestone in April 2020; treatment notes in February and April 2021 reflecting that she refused to take her medications; her March 2021 diagnosis of intermittent explosive disorder with a prescription for Zoloft; records of weekly counseling treatment; and observations by school behavioral specialist Ron Bruce in October 2020 and by intervention specialist Mary Battenfield in April 2021.  (Tr. 30-31.)  The ALJ further explained his findings regarding the two domains as follows:

> Contrary to Counsel's argument that assessments by Mr. Bruce and Ms. Battenfield establish the claimant's marked limitations with interacting with others and caring for self, the undersigned finds the school has not taken any disciplinary actions against the claimant to support her argument [].  In fact, prior to the implementation of the IEP in January 2021, Mr. Bruce noted the claimant refused to ask for help when she did not understand something [].  And, after the implementation of the IEP and the granted assistance of an intervention specialist, Ms. Battenfield observed the claimant has continued "to refus[e] help and does not complete classwork, refuses to ask for help, does not ask for help," and, because she is unable "cope with stress," "she will give up quickly, refuses to complete work or assessments and will leave the meeting entirely" [].
>
> As discussed, the claimant's school evaluation team noted, "<u>Academically, teachers report she is logging on to some activities and not others (not attending [English/Language Arts] and social studies, but is for math</u>," which bolsters <u>suggestions of a voluntary component to her poor academic performance</u> [].
>
> <u>The undersigned finds Mr. Bruce's assessment, Ms. Battenfield's assessment, and the claimant's teachers' observations strongly suggest there is a volitional component to the claimant's oppositional defiant disorder because she is deciding</u>

28

unilaterally which classes that she wants to attend via the virtual learning platform, and not just due to ADHD [].

Additionally, in non-school settings, the undersigned notes Ms. Ray told Dr. Levy that the claimant "does better with preferred social interactions" on May 8, 2020 []. The undersigned notes that the claimant's family has suffered the deaths of close family members, which suggests the claimant's recent behavioral outbursts are related to unmanaged bereavement issues []. The undersigned finds, however, the record fails to establish a significant worsening effect of these recent deaths on the claimant's mental functioning to suggest limitations greater than less than marked limitations in these two functional domains through the date of this decision.

Despite the claimant's inconsistent compliance with treatment and the volitional component to her behavior, the undersigned finds the longitudinal effects of the claimant's mental impairments have imposed no greater than less than marked limitations in interacting with others and for the emotional component to caring for self during the current adjudicating period.

(Tr. 31 (citations omitted) (emphasis added).)  The ALJ had previously made other references to

the "volitional component" of L.R's behavior, as follows:

Although the claimant has manifested signs and symptoms related to mood disorder and suicidal ideations, anxiety, and reactive anger which affects her ability to learn, the record strongly suggests a volitional component not to comply with recommendations with which she did not agree, such as listening to her mother, taking medications, and most significantly, missing sixteen days of school during the most recent school year via the virtual learning format since the Pandemic began because she did not like it and expressed her want to "return to in-person school" despite her mother's reservations.

* * *

Although the claimant was reportedly failing all of her classes around a diagnostic evaluation at Ohio Guidestone in April 2020, the record strongly suggests a volitional component to the claimant's unwillingness to attend school via the virtual learning environment due to the COVID-19 Pandemic protocol, and not only due to her anxiety. Significantly, the claimant's mother Ms. Ray observed the claimant's behavior problems "became more prevalent in the 5th grade" (*Id.*) The undersigned finds the claimant's school evaluation team noted, "Academically, teachers report she is logging on to some activities and not others (not attending [English/Language Arts] and social studies, but is for math," which bolsters suggestions of a voluntary component to her poor academic performance.

(Tr. 29-30 (emphasis added).)  At the conclusion of his decision, the ALJ went on to observe:

> The undersigned is persuaded by the function reports from Mr. Bruce and Ms. Battenfield to the extent their observations bolster longitudinal evidence in the claimant's school and counseling records, which establish the claimant has no longer been at a high risk of harm to herself or others since December 2019 []. Although Mr. Bruce and Ms. Battenfield do not explicitly opine a "volitional component" to the claimant's behavior, the undersigned finds their assessments bolster other evidence in the record that there is a significant volitional component to the claimant's conduct and conclude that the claimant is not precluded from functioning independently, appropriately, and effectively in an age appropriate manner during the current adjudicating period within the scope of the less than marked limitations set forth in this decision [].

(Tr. 32 (citations omitted) (emphasis added).)

In a nutshell, the ALJ found less than marked limitations in the two relevant functional domains based in part on what he characterized as a "voluntary" or "volitional component" to L.R.'s conduct, as evidenced by: not "listening to her mother" (Tr. 29); not "taking medications" (*id.*); "missing sixteen days of school . . . via the virtual learning format . . . because she did not like it and expressed her want to 'return to in-person school'" (*id.*); "unwillingness to attend school via the virtual learning environment" (*id.*); "logging on to some activities, and not others" (Tr. 31); and "deciding unilaterally which classes . . . she wants to attend" (*id.*).

Ms. Ray argues that the ALJ's reliance on this "volitional component" amounted to "improperly interject[ing] his own medical opinion . . . despite the fact that no medical source, teacher, or parent has stated that L.R.'s behavior is volitional and not the result of a medically determinable impairment."  (ECF Doc. 10, p. 13.)  In response, the Commissioner argues that the ALJ's consideration of a volitional component to L.R.'s behavior was supported by objective evidence suggesting "voluntary aspects" of her behavior, including treatment notes indicating she did not want to listen to her mother but was "willing to work on it," that she "hangs around with the wrong kids," that her family members did school work for her, that she fought with her mother about her phone usage, and that she would log on to certain classes but not others, and

counseling records suggesting she knew how to change her behavior when she wanted to get something from her mother.  (ECF Doc. 11, pp. 16-17 (citing records).)

Ultimately, the issue before the Court is not a factual dispute.  The evidence clearly supports the ALJ's finding that L.R. sometimes did not listen to her mother, refused to take medications prescribed to treat her medically determinable impairments, missed excessive amounts of school, and chose to participate in some school activities while refusing to participate in others.  The question presented here is whether it was appropriate for the ALJ to rely on this "voluntary" or "volitional" behavior as a basis to discount the severity of L.R.'s functional limitations.  In the specific circumstances of this case, the Court finds that it was not.

As the ALJ recognizes in his decision, the mental impairments primarily impacting the functional domains *interacting and relating to others* and *caring for oneself* are L.R.'s personality and impulse control disorders: ODD and intermittent explosive disorder.  (Tr. 30 (considering "the longitudinal effects of [L.R.]'s oppositional defiant disorder" in finding less than marked limitations in both domains); *see also* Tr. 26 (finding ODD and intermittent explosive disorder to be severe medically determinable impairments.)  In general, personality and impulse control disorders are described in the listing of impairments as follows:

112.00.B.7. Personality and impulse-control disorders (112.08):

a.  These disorders are characterized by enduring, inflexible, maladaptive, and pervasive patterns of behavior.  Onset may occur in childhood but more typically occurs in adolescence or young adulthood.  Symptoms and signs may include, but are not limited to, patterns of distrust, suspiciousness, and odd beliefs; social detachment, discomfort, or avoidance; hypersensitivity to negative evaluation; an excessive need to be taken care of; difficulty making independent decisions; a preoccupation with orderliness, perfectionism, and control; and inappropriate, intense, impulsive anger and behavioral expression grossly out of proportion to any external provocation or psychosocial stressors.

    b.  Examples of disorders that we evaluate in this category include paranoid, schizoid, schizotypal, borderline, avoidant, dependent, obsessive-compulsive personality disorders, and intermittent explosive disorder.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 112.00(B)(7).  Specifically, Listing 112.08 governs:

112.08 Personality and impulse-control disorders (see 112.00B7), for children age 3 to attainment of age 18, satisfied by A and B:

A.  Medical documentation of a pervasive pattern of one or more of the following:
1.  Distrust and suspiciousness of others;
2.  Detachment from social relationships;
3.  Disregard for and violation of the rights of others;
4.  Instability of interpersonal relationships;
5.  Excessive emotionality and attention seeking;
6.  Feelings of inadequacy;
7.  Excessive need to be taken care of;
8.  Preoccupation with perfectionism and orderliness; or
9.  Recurrent, impulsive, aggressive behavioral outbursts.

AND

B.  Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 112.00F):
1.  Understand, remember, or apply information (see 112.00E1).
2.  Interact with others (see 112.00E2).
3.  Concentrate, persist, or maintain pace (see 112.00E3).
4.  Adapt or manage oneself (see 112.00E4).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, 112.08.

In summary, the mental impairments at issue "are characterized by enduring, inflexible, maladaptive, and pervasive patterns of behavior" that may be evidenced by distrust of others, detachment from social relationships, disregard for the rights of others, unstable relationships, excessive emotionality and attention seeking, feelings of inadequacy, excessive need to be taken care of, preoccupation with perfectionism, and recurrent, impulsive, and aggressive behavioral outbursts.  20 C.F.R. § Pt. 404, Subpt. P, App. 1, 112.00(B)(7), 112.08.  In this context, it is not at all clear that the behavior highlighted by the ALJ as "volitional"—e.g., not listening to her mother, refusing to take medications, failing to attend school, and participating in some activities

32

but not others—was appropriately considered to *discount* the severity of the limitations caused by L.R.'s medically determinable impairments, instead of being considered as additional symptoms indicative of the *severity* of the limitations caused by those impairments.

The third and fourth questions to be considered in applying the "whole child" approach to assessing functional equivalence under SSR 09-1p are as follows:

> 3. *Could the child's medically determinable impairment(s) account for limitations in the child's activities?* If it could, and there is no evidence to the contrary, we conclude that the impairment(s) causes the activity limitations we have identified in each domain.
>
> 4. *To what degree does the impairment(s) limit the child's ability to function age-appropriately in each domain?* We consider how well the child can initiate, sustain, and complete activities, including the kind, extent, and frequency of help or adaptations the child needs, the effects of structured or supportive settings on the child's functioning, where the child has difficulties (at home, at school, and in the community), and all other factors that are relevant to the determination of the degree of limitation. 20 CFR 416.924a.

SSR 09-1p, 74 Fed. Reg. at 7528 (emphasis in original).  Under this guidance, the ALJ was required to consider whether L.R.'s impairments *could* account for demonstrated limitations in her activities; and if they could, the ALJ was required to find L.R.'s impairments *did* cause the limitations if "there [wa]s no evidence to the contrary." *Id.* Although the ALJ characterized certain of L.R.'s behaviors as "volitional"—as opposed to symptoms of her impairments—he did not identify any evidence in the record to support that characterization.  Indeed, he acknowledged that school behavioral specialist Mr. Bruce and school intervention specialist Ms. Battenfield "d[id] not explicitly opine a 'volitional component' to [L.R.]'s behavior."  (Tr. 32.)

An ALJ's decision should not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.  Here, the ALJ characterized certain of L.R.'s behaviors as "volitional" or "voluntary," and made it clear that such behaviors were weighed against the severity of L.R.'s

functional limitations.  (Tr. 29-32.)  However, a review of the applicable Listing suggests that at least some of the identified behaviors could alternately represent symptoms resulting from L.R.'s impairments.  *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 112.00(B)(7), 112.08.  Under SSR 09-1p, the ALJ was required to find any limitations that *could* be caused by L.R.'s impairments *were* caused by those impairments, absent "evidence to the contrary."  SSR 09-1p, 74 Fed. Reg. at 7528.  Despite this requirement, the ALJ did not identify any evidence, beyond his own characterization of L.R.'s behavior, to support a finding that the behaviors in question were not caused by L.R.'s mental impairments.  In this circumstance, the Court finds that the ALJ failed to "build an accurate and logical bridge between the evidence and the result," *Fleischer*, 774 F. Supp. 2d at 877, and rendered a decision that lacked the support of substantial evidence.

For the reasons set forth above, the Court finds the ALJ failed to build an accurate and logical bridge to support his finding that L.R. had less than marked limitations in the functional domains of interacting with others and caring for oneself.

## VII.    Conclusion

For the reasons set forth above, the Court **VACATES and REMANDS** the decision of the Commissioner for further proceedings consistent with this Order.  On remand, the ALJ should consider all evidence of record and articulate a clear and accurate explanation for his functional equivalence findings, building a logical bridge between the evidence and the result.

February 9, 2024

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge